IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| John Woods, | ) | C.A. No.: 2:11-CV-2855-RMG-BHH |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **OBJECTION OF PLAINTIFF JOHN WOODS** |
| | ) | **AND MEMORANDUM IN SUPPORT OF HIS** |
| | ) | **OBJECTION TO REPORT AND RECOMMENDATION** |
| | ) | |
| vs. | ) | |
| | ) | |
| The Boeing Company, | ) | |
| Defendant. | ) | |

Plaintiff, John Woods ("Woods"), by counsel, pursuant to 28 U.S.C. §636(b)(1)(C) and Fed.R.CivP. 72 (b), hereby objects to certain portions of the June 10, 2013 Report and Recommendation of United States Magistrate Judge Bruce H. Hendricks ("R&R"). As set forth more fully below, Woods respectfully requests that the Court: (1) not adopt the portions of the R&R granting Boeing's Motion for Summary Judgment as to Plaintiff's claims under the Americans With Disabilities Act "ADA," as amended by the ADAAA, for discriminatory discharge and hostile work environment, and (2) adopt those portions of the R&R denying Boeing's Motion for Summary Judgment as to failure to accommodate and retaliation, and thus, (3) deny Boeing's Motion for Summary Judgment as to all claims.

## INTRODUCTION

Boeing terminated John Woods 8 working days after implementing only one of the four reasonable accommodations suggested by his physician for his diagnoses of Obsessive Compulsive Disorder, Attention Deficit/Hyperactivity Disorder, and Dysthymia. As a result of its "interactive" meeting, Boeing essentially told Woods which accommodation its management

had approved and did not engage in any further dialogue after the fact or allow any significant time had pass in which to evaluate whether that accommodation was even working.1 Boeing did not ask Woods's physician to clarify or modify any of his recommendations, nor did it counter with additional or alternative suggestions from its extensive resources. Moreover, prior to termination, Boeing did not even check by its own yardstick to see that Woods was actually improving his performance after its disciplinary measures were imposed.

In the one year in which John Woods worked for Boeing, ten months were spent researching and developing the planning documents known as "repair templates," organizing training for production repair, and advising on repairs in progress. The last two months were spent creating the repair templates which, as of July, had become top priority. Measured against that narrow timeframe in which the repair templates were his essential job function, Woods was fired in September, only two months into his revised job description. Measured against his Performance Improvement Plan "PIP," issued August 15, 2010, Woods was fired only 36 days after its issuance (30 days extended one week for jury duty). Notwithstanding whether the PIP was even proper in the wake of Woods's requested accommodations, at the time of termination, Woods had admittedly improved in several areas, most notably in communication and timeliness. However, management chose to ignore that success and instead measured his performance in a vacuum, without regard for his admitted improvement, and without regard for how his accommodations should factor into the equation. In short, the vote was counted long before the polls closed. The Magistrate Judge applied the law correctly as to Boeing's failure to accommodate and retaliation, but for the same reasons, the facts mandate denial of summary judgment on the remainder of the claims.

---

1 Boeing contends that it was already implementing another of the recommendations about Woods operating in either a supervisory or non-supervisory role but not at the same time.

## STANDARD OF REVIEW

In its *de novo* determination, the "judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate. The judge may also receive further evidence or recommit the matter to the magistrate with instructions." 28 U.S.C. § 636(b)(1). See generally *Camby v. Davis*, 718 F.2d 198, 199-200 (4th Cir.1983) and *United States v. George*, 971 F.2d 1113 (4th Cir. 1992). Here, where the Magistrate has pointed to several pieces of evidence which precluded summary judgment on two claims, and where those pieces of evidence would be applicable to the other two claims, it would be appropriate for the Court to modify the recommendations of the Magistrate and deny summary judgment as to all four claims.

### Discriminatory Discharge

In recommending against summary judgment on Plaintiff's claims of failure to accommodate and retaliation, the Magistrate centered upon the following three pieces of evidence: (1) an email from a senior manager which a jury might interpret as some indication that a "preconceived determination concerning accommodations" had been made prior to the interactive meeting (2) that Boeing neither followed up with plaintiff's physician nor offered accommodations of its own and (3) that Plaintiff was terminated only 36 days after the issuance of the PIP and CAM. Taken together, the Magistrate believed those pieces of evidence created "issues of fact as to bad faith in the interactive process." R&R at 15.

Yet, those three pieces of evidence should have been applicable to plaintiff's discriminatory discharge claims, in which he must show that (1) he is disabled; (2) he was discharged; (3) at the time of the discharge, he was performing his job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise

a reasonable inference of unlawful discrimination. The first two elements were not disputed. Although not specifically ruled upon, it appears that the Magistrates' findings would support the fourth element, a reasonable inference of unlawful discrimination. However, the Magistrate erred in concluding that Woods failed to meet the third element when she found "what is virtually undisputed in the record was that plaintiff had failed produce essentially any of the required work." R&R p. 18, para 3. The existence of an issue of fact as to bad faith in the interactive process should have called into question on every other judgment call made by Boeing management, including their evaluation of his job performance and their legitimate expectations.

One of the most salient facts is that for the first ten months at Boeing (September –June), John Woods was unsupervised. Depo. Marie Lazcynski Vol. 1 pp.54. Until Marie Lazcynski became his supervisor in June, he had no real feedback and no one was tracking his deadlines Depo Marie Lazcyinski Vol. 1, p 22. Thus Woods had no gauge of what his employer's legitimate expectations might be, except his written job description at the time of hire. Apparently Ms. Laczynski had very different expectations than his first supervisor. The following is what Woods understood at the time of hiring, taken directly from the job description for "Engineering-Planner Manufacturing 3":

> **Overview:**
>
> Designs and plans layout for such activities as machining, metal forming/ plastics processing, welding and brazing, assembly, and materials handling. Adapts machine or equipment design to factory and production conditions. Plans for the arrangement of machines within plant facilities to ensure most efficient and productive layout. Plans sequence of operations and specifies procedures for the fabrication of tools and equipment and other functions that affect product performance. May incorporate

inspection and test requirements into the production plan. Inspects performance of machinery, equipment, and tools to verify their efficiency, and investigates and initiates corrective action of problems and deficiencies to ensure product quality. Develops manufacturing processes that are applicable to statistical process control, and may develop those techniques. Provides guidance to Engineering regarding design concepts and specification requirements to best utilize equipment and manufacturing techniques.

**Responsibilities:**

Confers with management and other staff regarding manufacturing capabilities, production schedules, etc. to facilitate production processes. Applies statistical methods to estimate future manufacturing requirements. [TBC/CONFIDENTIAL 000035]

This is what his supervisor Marie Laczynski understood about his job description:

> "I don't know what he was hired to do. I wasn't there when he was hired. What I needed him to do was write the templates and I told him that's what he needed to do." Depo. Marie Lazcynski Vol. 1, p. 32.

Perhaps there was some genuine confusion about exactly what was expected of John Woods on a daily basis, since no one formally changed the job for which he was hired, but at a minimum, it is a question of fact for a jury to decide.

Moreover, there were varied expectations among the teams as to whom Woods was supposed to answer to and when. Particularly with the expectations of the "customer" (production), the review and comment process was fraught with problems beyond Woods's control. He sent documents to Production for review but noted several times that he had not received feedback. Yet, no matter who was supposed to measure the efficacy of his work, his management clearly felt Woods was not performing and placed him on a Performance Improvement Plan.

>According to the PIP, Woods was to:
>
>1. Re-baseline repair planning template release schedule and complete templates on time and/or get help before due date
>2. Address speed of response and work release
>3. Improve customer interaction and team work
>4. Improve Communication

The Completion/Follow up dates were 8/26/10, 9/7/10, and 9/20/10 [TBC/CONFIDENTIAL 000086] The decision to terminated Woods was made on September 20th. Depo. Marie Laczyinski Vol. 2 p. 196. That was eight working days after the reasonable accommodations meeting. Id. However, even on the face of Boeing's PIP, there was no set number of templates to be completed by each review period. As noted by the Magistrate, there were many revised schedules, but, again, there was confusion over exactly when the entire project was to be complete. It is undisputed that one template was approved and released. Woods 2245-2279 'Planning Alert Bulletin and Stringer Overlay Planning Template 6 Plies or Less." It is admitted that Woods was trying to support customers, he was trying to honor time commitments, and trying in the communication--doing really well with e-mails. Depo. Marie Lazcynski Vol. 2 187-189. Additionally, there was evidence that within the revised schedule, Woods had actually met the revised deadlines. However, his supervisor admitted neither she nor anyone else to her knowledge checked on his computer to see whether he had actually continued to work on the templates. Depo. Marie Laczynski Vol .2 p. 193. The Magistrate found "at best he completed 4 of 17." However, under the revised schedule in play at the time of termination in September, they were all due in January— four months after termination. If 3 or 4 of 17 were completed in two months, then who could say that the remainder could not be completed by January? Under

that standard, it can be said that Woods was meeting the legitimate expectations of his employer, or at worst, his employer did not have proof to the contrary.

However, even if the expectations were not met, they must be viewed in the same light as the bad faith interactive process. That is, if there is evidence that Boeing failed to accommodate and engaged in retaliation, certainly the legitimacy of its expectations was questionable. Moreover, in this case, there is objective evidence that Boeing's expectations were not in line with industry standards. On Woods' report, the FAA came in to correct a problem in the planning instruments. Woods 0011.

Finally, there was evidence that his fate was sealed perhaps even earlier, as explained below. In this case, there is actual proof of hostility that was building.

## Hostile Work Environment Claim

In order to prevail on a hostile work environment claim, Woods must prove (1) unwelcome harassment; (2) based on protected status [disability] (3) that is sufficiently severe or pervasive as to alter the conditions of his employment and create an abusive atmosphere; and (4) that is imputable to the defendant. *EEOC v Cent. Wholesalers, Inc*, 573 F.3d 167, 175 (4th Cir. 2009). The Magistrate was correct on the issue of fact in plaintiff's subjective impression, which was readily apparent. R&R 19. But even under the objective standard, plaintiff has shown at least a question of fact.

As a matter of law, objective severity should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances giving careful consideration of the social context in which particular behavior occurs and is experienced by its target.

Whether an environment is "hostile" or "abusive" can be determined only by looking at

all the circumstances. *Harris v. Forklift Systems, Inc.* 510 U.S. at 23, 114 S.Ct. 367 (1993). These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required. *Harris Id.* A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field—even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive. *id*. The Magistrate correctly points out that no one teased Woods or threatened him physically. R&R 19. But the type of harassment Woods suffered was far more subtle than water cooler banter, pornography on a desk, or racial slurs in the break room. It is essential to consider the social context of John Woods and his fellow Boeing employees.

    This particular constellation of employees is comprised of highly sophisticated, intelligent aerospace engineers whose subject matter is the first of its kind all-composite fuselage

commercial aircraft. The harassment Woods experienced was a series of carefully manipulated events which capitalized on Woods' disabilities. The record is replete with co-workers and supervisors being annoyed by Woods, and Woods seeking Boeing's assistance to combat the annoyances, part and parcel of his disabilities, that drove his co-workers to conduct beyond that which a reasonable person in plaintiff's position could withstand. Putting ourselves in Woods position, considering all the circumstances, it may be difficult to appreciate the context of these three mental impairments-OCD, ADHD, and depression—it would be far easier to put ourselves in the shoes of a wheelchair bound employee than one whose brain confines his thoughts. If the co-workers of a wheelchair bound employee made comments about his wheelchair taking up too much space, we would view it as patently offensive. What happened to John Woods was objectively as troublesome considering his disabilities.

Tom Mann emails (TBC 001642-001644)

The emails behind Woods's back show that it was not only his perception that people were trying to get him fired—they actually were trying to get him fired-and one of the reasons for their dissatisfaction was his tendency to communicate too broadly. As Tom Mann wrote to Wood's Senior Manager, "Can you find a new home for him, he's obviously disgruntled, and over his head. This is getting ridiculous. Every day its 3 or 4 of these that I'm copied on, who knows what else. He includes everybody that has heard of repair on his emails. I've complained numerous times, now I recommend he be moved out of composites completely. Pleas [sic] let me know the path forward." In short, for a person with OCD, ADHD, and depression whose job is design the repair templates that conform to the law, this atmosphere was the perfect storm. Was this conduct so pervasive as to alter the conditions of his employment and create an abusive atmosphere? Woods certainly believed that was the case, but, even by objective standards, so did

Marie Laczynski. If the task on summary judgment is to identify situations that a reasonable jury might find…instances where the environment was pervaded with discriminatory conduct 'aimed to humiliate, ridicule, or intimidate,' thereby creating an abusive atmosphere," then the most obvious evidence is Boeing's own admission.

EEO Investigation Report

When Marie Laczynski met with Boeing's EEO investigator, she stated that she "was aware that [Laura] Bogush can be aggressive and impatient, and she is aware that this causes Woods stress." Moreover, Ms. Laczynszi was subjected to similar conduct by Bogush in which Robert Gulley decided to attend meetings after she complained about Bogush. Depo. Robert Gulley Vol. 1 p. 201-203. So of all people, Ms. Lacznski should have known that a reasonable person in this position would feel threatened. Also, Robert Gulley had himself received a corrective action memorandum in May 2009 and admitted at his deposition that he "got some advice that, you know, basically how I'm doing, how I've been a leader all along is not working anymore under Boeing." Depo. Robert GulleyVol. 1 p.21-26. While Boeing may now disavow whether a particular person intimidated Woods, at the time, its chief witness believed so. Most telling is that Boeing was on notice that the disability was a factor in the harassment—because Woods spelled it out in his complaint. Thus, taken as a whole, the collective actions of co-workers, expressed overtly in hostile meetings and covertly in behind the scenes emails unreasonably interfered with Woods's work performance.

Boeing on Notice of Disability and Harassment

Because objective severity of harassment is judged from the perspective of a "reasonable person in the plaintiff's position" our analysis requires insight into his disabilities. We do not have to speculate since Woods laid out in his supplemental accommodations requests exactly

how his communication was affected: "attention deficit results in verbal communication difficulties for me such as diminished ability to be tactful" …Understanding that a lifetime of being scolded or negatively judged makes me fearful around management, defensive, and it also contributes towards verbal communication difficulties. It also results in an overly serious personality."

Not only did Woods have significant insight into his behaviors, he was keenly aware of how his disabilities affected others—I also feel it necessary for my management's sustained special attention to: Boeing POL-3 "People" as an accommodation in regards to chronic mild depression, chronic poor self-esteem, to counteract **their annoyances resulting from my other identified handicaps**, and to counteract the difficulty that can be expect [sic] in management's (anybody's) ability to sustain the application of affirmative action in support of an employee with invisible handicaps" (emphasis added).  TBC/CONFIDENTIAL AT 000336, cited in R&R at 8.

Finally, although the Magistrate noted the speed at which termination occurred--36 days after his PIP-- she did not cite to the most critical piece of evidence in the record--that Woods was terminated after only 8 working days after the one RA was adopted. The speed at which Boeing terminated Woods is evidence in and of itself of the hostility which was so severe and pervasive as to alter the conditions of his employment. That is, they did fire him—and only a few months after Tom Mann suggested that he be removed from composites altogether.  And certainly Boeing will claim that Woods was unaware of these communications until they were produced[2], John Woods knew without a doubt that he was being bad mouthed.

Because Boeing did nothing to alleviate the underlying hostility, the harassment is imputable to its management. Thus, Woods has met the elements of a hostile work environment

---

2  Boeing did not produce these emails until after discovery had closed.

claim and summary judgment should be denied.

## CONCLUSION

For the foregoing reasons, Woods respectfully requests that the portions of the Report and Recommendations granting summary judgment not be adopted and that summary judgment be denied on each of Woods' claims.

                                      Respectfully Submitted,

                                      GRIMBALL & CABANISS, L.L.C.

                                      By     *s/ LAURA C. WARING*
                                                    LAURA C. WARING, FED.ID.#9199
                                                    PO Box 816
                                                    Charleston, SC 29402
                                                    (843) 722-0311
                                                    e-mail: laura.waring@grimcab.com
                                                    ATTORNEY FOR THE PLAINTIFF

Charleston, SC
June 27, 2013